THE STATE OF MISSOURI *ex rel.* T. Z. BLAKEMAN, Relator, *v.* SAMUEL HAYS, STATE TREASURER, Respondent.

1. *Mandamus — Appropriations — Warrants on treasurer.* — The return of the treasurer on an application for a *mandamus,* that the appropriation has been exhausted, is sufficient.

2. *Constitution of Missouri — Treasurer.* — The treasurer has no discretionary power, and can only disburse as the law-making power shall direct. (Art. XI, § 6.)

3. *Contracts — Alien enemies, supplies furnished to.* — Parties knowingly furnishing munitions of war to alien enemies cannot demand compensation from the State on the ground that all the formalities of the law have been complied with and a warrant issued for the money.

Per WAGNER and ADAMS, Judges.

4. *Statutes — Motives of Legislature.* — If a statute is regularly passed, the motives of the law-making power cannot be inquired into in order to invalidate it.

5. *Governor — Illegal acts under color of law — Liability of the State.* — If the governor, pretending to act in pursuance of the law, should purchase munitions of war for the enemies of the national government, and the vendors should know the object of the purchaser at the time of sale, they would have no claim against the State.

*Appeal from St. Louis Circuit Court.*

*T. Z. Blakeman,* with *Krum & Patrick,* for relator.

"The intention of the Legislature is to be found in the statute, itself, and there only." (Sedgw. Stat. and Const. Law, 230, 243 ; *In re* Powers, 23 Verm. 265 ; Hadden v. The Collector, 5 Wall., U. S , 111 ; Fisher v. Blight, 2 Cranch, 358, 399 ; Brown v. Bough, 14 Pet. 198 ; Ellis v. Payne *et al.,* 1 Pick. 43 ; Story on Cont., § 624.)

"But bare knowledge on the part of a vendor, that the vendee intends to put the goods to an illegal use, will not vitiate the sale and deprive the vendor of all remedy for the purchase-money." (See Kreiss v. Seligman, 8 Barb. and authorities cited.)

*A. J. Baker,* Attorney-General, for respondent.

BLISS, Judge, delivered the opinion of the court.

This writ was sued out to compel the payment of a warrant upon the State treasurer, issued May 16, 1861, by the auditor of public

accounts, to E. J. Dupont & Co. for $5,000. The petition sets forth the organization of the "military fund" under the act of May 11, 1861; shows that under the act it became the duty of the auditor, upon the governor's order, to draw his warrant upon the treasurer; that this warrant was regularly drawn; that there was then money in the treasury appropriated to its payment, and that there has ever since remained in the treasury, so appropriated, sufficient to pay the same, but that the treasurer refuses to pay it.

The return admits the passage of the act, the issue of the warrant and the refusal to pay it, and proceeds to show, in substance, that previous to its passage a large number of citizens of the United States had risen in rebellion, to suppress which the President had called in service 75,000 men, and for their supply had made a requisition upon the governors of the States; that Governor Jackson of Missouri expressly refused to obey the requisition, placed himself in open rebellion, called an extra session of the Legislature, who passed the act spoken of to aid him in waging war against the United States, under which act troops were raised for the purpose; and that the warrant in question was drawn in payment for powder and munitions of war furnished in furtherance of said design. The return further states, in the nature of a second count, that at the date of the warrant, the United States were engaged in a war for the suppression of the rebellion, and and her troops were occupying portions of the State of Missouri; that Claiborne F. Jackson, governor, for the purpose of resisting said troops in their efforts to suppress the rebellion, called out the militia of the State, and with them did resist said troops and engaged in hostilities; that said warrant was drawn to pay for powder and munitions of war for the use of the militia so engaged in hostilities, which facts were known to the relator and to all through whom he claims title to said warrant. The respondent further denies that there has remained in the treasury, or is now in it, any money appropriated to pay said warrant, or appropriated to said military fund. To this return the relator demurs.

The treasurer cannot be required to pay out the funds intrusted to his keeping unless appropriated; as the minister of the State, with no discretionary powers, he must disburse when and as, and

only when and as, the law-making power shall direct. (Const. Mo., art. XI, § 6.) He usually looks only to the warrant, but is not bound by that if drawn without an appropriation. And if an appropriation lawfully made be exhausted, his payments must necessarily stop. Hence that part of the return denying, in effect, that there is money in the treasury appropriated for the purpose, furnishes a complete excuse for his refusal. But inasmuch as the relator criticises the form of this denial, I will consider another question raised by the return. I do not feel called upon to express any opinion upon the character of the legislative act of May 16, 1861, or the *status* of those called into the field before engaging in hostilities. Yet, saying nothing as to whether the legislative intention can be inquired into, except as shown in the act—a question pertaining rather to enactments in a state of peace that of civil war— we, doubtless, can consider all the circumstances surrounding and prompting the act, in showing the *animus* of those who took the field under it, and who furnished them with supplies.

But the return is too plain to render even this necessary. It shows directly that the warrant in question was drawn for the purchase of powder and munitions of war, which were furnished to enable the troops raised by said Jackson to wage war against the United States. We may concede, though of that no opinion is called for, that the militia when called out was a lawfully organized State force ; and yet the moment they turned their arms against the United States 'the cloak of legality fell, and they became as truly public enemies as any troops raised in the later stages of the war, and their arms must be deemed to have been so turned when the unlawful design was formed and preparations for actual hostilities were being made. The court will take notice of public events, and of the fact that when this warrant was issued, a body of this militia had been treated as enemies and captured by Federal troops, and also that other bodies subsequently engaged in actual war against the United States ; and thus color and support is given to the allegation that the munitions of war, forming the consideration of this warrant, were purchased for hostile purposes. This fact, in connection

with the knowledge charged upon the seller, places the transaction beyond the protection of the law.

I can hardly bring myself to seriously consider the claim made by counsel, that the State is under obligation to pay for munitions of war knowingly furnished in aid of a war against the United States, of which it is a constituent part, provided those who used them were first lawfully called into the field, and provided warrants, regular in form, were drawn for their payment. These facts do not tend even to make the claim a lawful one. An army becomes more than an enemy if it turn its arms against its own government, and those who knowingly furnish the means to aid its unlawful acts, although under the form of lawful supplies, participate in its acts. The fact that Governor Jackson was lawfully elected and qualified—that that portion of the State militia which he led into the Confederate service had been lawfully organized and called out — if that be conceded, furnishes no excuse or claim for compensation to those who knowingly supplied them with the means of engaging in hostilities, although a warrant upon the treasury was issued under the forms of law.

The demurrer will be overruled. The other judges concur in the result.

### SEPARATE OPINION OF JUDGE WAGNER.

The question raised by the respondent in his return, as to the invalidity of the act of the Legislature, cannot, in my opinion, be inquired into in this proceeding. The law was passed by a regularly constituted body, with all the formalities prescribed by the constitution. There is no dispute about the fact that the members of the Legislature and the governor were legally elected and duly qualified, and, as such, were in the proper discharge of their legitimate functions. They were, then, competent to pass any law within the sphere of the law-making power, and that law would be void only on the ground that it was in opposition to the constitution of the State, or violative of the constitution or laws of the United States. The motives which actuated the law-makers in the passage of the act, we are precluded from examining or looking into. The Legislature is a co-ordinate branch of the

State government, and in the enactment of laws is entirely independent of the judiciary; and if the laws are otherwise legal, the courts have no power to annul or set them aside on the ground that the members acted from improper or unlawful views. The militia law of 1861 was not illegal *per se*, and had its execution been placed in the hands of an executive entertaining different sentiments from those of Gov. Jackson, it might have been made an efficient instrument in upholding the national authority. A law otherwise valid will not be declared void simply because those who are intrusted with its execution pervert it to an illegal or improper purpose. But no law passed by a State Legislature could legally authorize the governor to use his powers and patronage to engage in armed hostility against the United States government. If, pretending to act in pursuance of the law, he engaged in an unlawful purpose, and purchased munitions of war, and armed and equipped troops and sent them to the field in hostility to the national government, all his acts as such would be void. And those who assisted him by selling him arms or powder, or any article in furtherance of his designs, if they knew the objects for which they were intended to be used, would be guilty of illegally abetting him, and could not recover from the State the value of the things sold. The treasurer can only pay money on warrants when there is money in the treasury specifically set apart and appropriated for their payment. The return states that no money has remained in the treasury, nor is now in the treasury, appropriated for the payment of the warrants in question. Whilst the denial is not as specific and definite as the rules of good pleading require, it sufficiently appears that there is not now in the treasury any money applicable to the payment of the demand. If such is the case the writ could not issue, for it would be fruitless.

The demurrer admits the facts stated in the respondent's return, that the relator and those under whom he claims knew that the powder for which the warrant was given was to be used for an illegal purpose, and that there is no money in the treasury appropriated for its payment. Judgment, then, must be entered overruling the demurrer and in favor of the respondent.

I am requested to state that in this opinion Judge Adams concurs.